## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| JESSICA E. J., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Case No. 3:24-cv-00299-DWD** |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | | |

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of Defendant's final agency decision denying Plaintiff's applications for a Period of Disability and Disability Insurance Benefits. Plaintiff presents two narrow issues for consideration. (Doc. 9, P.1) First, Plaintiff complains that the ALJ did not comply with SSR 96-8 which requires that, when a medical opinion conflicts with the RFC, the ALJ must explain why that opinion was not adopted. Second, Plaintiff complains that the ALJ failed to comply with SSR 00-4p in that he did not resolve an "apparent conflict" between a vocational expert's opinion that an individual who could not carry out detailed instructions could perform jobs requiring the ability to carry out detailed instructions.  For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant.

### I.        Procedural History

On November 21, 2019, Plaintiff filed an application for a Period of Disability and DIBS. (Doc. 6-5, p. 5). In her application, Plaintiff alleged a disability onset date of

September 15, 2017. (*Id.*). Plaintiff's claims were initially denied on March 5, 2020, and then again on reconsideration on April 7, 2021. (Doc. 6-3, pp. 2-22). Upon Plaintiff's request, Plaintiff's claims were the subject of evidentiary hearings on February 14, 2022 and April 17, 2023.[1] (Docs. 6-2, p. 23; 6-3, p. 26; 6-4, p. 15). In a decision dated October 4, 2023, an Administrative Law Judge ("ALJ") found Plaintiff was not disabled, resulting in a denial of her application for DIBS by Defendant. (Doc. 6-2, pp. 23-40). On December 8, 2023, the Appeals Council denied Plaintiff's request for review. (*Id.* at 2-6). Therefore, the ALJ's decision is final for purposes of the Court's review. Plaintiff exhausted her administrative remedies and timely filed a Complaint. (Doc. 1).

## II.    The Evidentiary Record

Plaintiff was born on April 1, 1993, and was 28 years old on the date last insured. (Doc. 6-3, p. 40). The alleged disability stems from diagnoses of posttraumatic stress disorder (PTSD), major depressive disorder (MDD), anxiety disorder, panic disorder, and adjustment disorder. (*Id.* at 29).

On September 17, 2018,[2] Plaintiff reported to a behavioral health clinic with complaints of sleep disturbance, feeling scared and nervous, mood swings, and morbid ideation within the prior 30 days. (Doc. 6-7, p. 55). Plaintiff also complained of experiencing difficulty concentrating, being easily annoyed, nightmares, unwanted

---

[1] After the ALJ's first decision, the Appeals Council remanded the matter because the ALJ had mistakenly only considered the period through March 31, 2021, in her decision, when Plaintiff was actually insured for benefits through September 30, 2021. (Doc. 6-3, p. 51). On remand, the ALJ held another hearing and issued a second decision. (Doc. 6-2, pp. 23-40). The ALJ's second decision is the subject of the instant appeal.
[2] Although Plaintiff alleges a disability onset date of September 15, 2017, there is no record of her mental health concerns until September 17, 2018. (Doc. 6-2, p. 31).

memories, no energy, disassociating, appetite disturbance, and hopelessness. (*Id.*). She indicated that childhood sexual abuse and an incident in 2016 when her infant nephew passed away while in her care correlated with the onset of her symptoms. (*Id.*). At that visit, her provider noted she exhibited a depressed and anxious mood, with flat effect, and a decreased attention span. (*Id.* at 56). However, her provider also observed that she was cooperative with normal eye contract, had linear, logical, and goal-directed thoughts, and was oriented to person, place, time, and situation. (*Id.*). Additionally, her recent and remote memory, judgment, and insight were noted as within normal limits. (*Id.*). Plaintiff was prescribed Effexor. (*Id.* at 47).

In October 2018, Plaintiff attended weekly psychotherapy appointments with Irma Jeffries, L.S.C.S.W. (Doc. 6-9, p. 268-273). Plaintiff presented with concerns regarding PTSD, her nephew's death, and insomnia. (*Id.* at 268, 270). On mental status examination, her mood was appropriate to the situation, and her behavior, perception, thought process, cognition, judgment, and insight were otherwise normal. (*Id.* at 269). Additionally, Plaintiff had a follow-up call with the behavioral health clinic on October 22, 2018. She reported that she stopped taking Effexor after approximately one week "due to not wanting to be on medication." (Doc. 6-7, p. 45). She stated that did not want to try another medication at the time because she was happy with her provider and weekly counseling visits. (*Id.*).

At an appointment with Ms. Jeffries on November 26, 2018, Plaintiff presented more engaged and animated and less numb in affect. (Doc. 6-9, p. 274). She had an appointment two weeks later, where she said that she was doing well and went through

3

day of the anniversary of her nephew's death in a "healthy grieving fashion for the first time." (*Id.* at 276).

During an emergency room visit on January 16, 2019, for an ankle injury, Plaintiff again reported she was not taking medications. (Doc. 6-7 at 38-39). Her mood and affect were found to be normal on mental status examinations at that visit. (*Id.* at 40). Then, on October 21, 2019, at another emergency room visit for physical concerns related to a sore throat, Plaintiff reported that she had returned from a 15-hour car ride from the state of Georgia, with no adverse effects. (*Id.* at 78-79).

Plaintiff visited Ms. Jeffries for psychotherapy approximately once a week in February, November, and December 2019, and in February, March, May, and June of 2020. (*Id.* at 278-288). She generally presented as anxious, disheveled, sometimes with motor restlessness and distractable, but otherwise normal. (*Id.*). At a visit in December 2019, Plaintiff indicated that she was not receptive to medication management but wished to manage her symptoms with diet. (*Id.* at 288). On June 3, 2020, Plaintiff reported that she had met with a medication provider, but did not get her prescriptions for Ativan, Lexapro, and Seroquel filled because she was not sure what she wanted to do. (*Id.* at 310).

On June 6, 2020, Plaintiff presented to a mental health clinic with anxiety and panic attacks. (Doc. 6-7, p. 154). She reported that her panic attacks "go[t] better" but that they had "flare[d] up again." (*Id.*). She also complained of struggling with sleep and worrying, but "fear[ing] meds." (*Id.*). She was again prescribed Lexapro, Seroquel, and Ativan. (*Id.* at 155).

At appointments with Ms. Jeffries on June 10 and 17, 2020, Plaintiff appeared disheveled and with poor hygiene, an inappropriate affect, and circumstantial thoughts. (Doc. 6-9, p. 312). Ms. Jeffries stated that Plaintiff was "not open to suggestions and if suggestions are accepted she does not follow through with them or complete homework." (*Id.* at 314-25). Plaintiff indicated that she did not want to work, saying "why would I?" (*Id.*). She continued to not take her medications, and Ms. Jeffries noted that she was "not making advances." (*Id.*).

Then, at a follow up for her emergency room visit on July 2, 2020, Plaintiff indicated that she used Ativan as a "rescue medication" and "that is the only thing she has tried." (Doc. 6-7, p. 157). She stated that her sleep had improved and that the Ativan and therapy were helping her. (*Id.*). On mental status examination, her mood, attention, eye contact, memory, affect, insight, and judgment were found to be normal, and she showed some improved anxiety. (*Id.* at 158).

In July, August, and September 2020, Plaintiff continued to see Ms. Jeffries approximately once a week. (Doc. 6-9, pp. 318-333). Her psychotherapy records for July are generally consistent with improvement in her symptoms. (*Id.* at 318-322). Though she exhibited an agitated affect and complained of increased panic attacks on July 29, 2020, she reported that she was experiencing decreased panic attacks on August 12, 2020. (*Id.* at 322-324). At her August visits, she would often appear disheveled and anxious, and sometimes agitated with motor restlessness. (*Id.* at 318-327).

On September 2, 2020, Plaintiff appeared at her appointment with Ms. Jeffries as disheveled, distractable, agitated, anxious, irritable, and with poor hygiene. (*Id.* at 328).

She did not participate in the visit, and was distracted by her phone, watch, and texting. She did not complete her homework and did not want to do medication management. (*Id.* at 328-29). Ms. Jeffries asked Plaintiff if she wanted a referral to meet with another provider, but Plaintiff said she did not. (*Id.* at 329). Plaintiff participated in her next visit with Ms. Jeffries on September 16, 2020, and her mental status examination noted a normal appearance, hygiene, and thoughts. (*Id.* at 330). However, she was agitated, angry, anxious, and restless. (*Id.*).

Then, on September 30, 2020, Plaintiff met with Ms. Jeffries for the final time. (Doc. 6-9, p. 332). At that visit, Plaintiff was distracted by her computer and did not participate in the conversation. (*Id.*) Plaintiff reported that she was having panic attacks but was unwilling to take prescribed medication because she was "ok with panic attacks." (*Id.*) She initially did not respond to Ms. Jeffries' query regarding a follow-up appointment, but then agreed. (*Id.*) However, she followed-up a few minutes after the visit concluded, stating she wished to pursue therapy with another therapist. (*Id.*) When Ms. Jeffries attempted to provide her with information on obtaining a referral and acknowledged that Plaintiff might benefit from in-person therapy to avoid distraction from her computer or children, Plaintiff yelled at her and became verbally abusive. (*Id.*). Ms. Jeffries recommended Plaintiff be discharged from therapy due to non-participation in therapy and medication management, as well as for verbal abuse and threats. (*Id.*).

On January 8, 2021, Plaintiff visited the emergency room for a panic attack. (Doc. 6-7, p. 186). At a follow up on January 21, 2021, Plaintiff reported that she had been taking Lexapro for the previous two weeks and that it helped her panic attacks decrease from 4-

5 per day to 1-2 per day. (*Id.*). She indicated that she was seeing a counselor every other week and had scheduled a follow-up visit with a psychiatrist, Ted Wunderlich, Psy. D. (*Id.* at 186, 293). She stated she was happy with her current care. (*Id.*).

On February 6, 2021, Plaintiff reported that her anxiety had improved while taking Lexapro and that her panic attacks had decreased to one per week. (*Id.* at 289). Additionally, she stated that had been taking melatonin which helped her sleep. (*Id.*).

During a counseling session on March 9, 2021, Plaintiff cried and explained that she was experiencing stress related to an incident on social media. (*Id.* at 301). On mental status examination, her mood was sad, depressed, and anxious, but she was otherwise normal. (*Id.*).

On April 15, 2021, Plaintiff reported her anxiety had decreased significantly and was under control, despite a recent visit to the emergency room for a panic attack. (*Id.* at 247). Her mental examinations were normal and noted some anxiety. (*Id.* at 248).

On July 6, 2021, Plaintiff indicated her anxiety was under control and she rarely took Ativan, but also stated she forgot to take her medications for a bit and "did not feel ok." (*Id.* at 249). Her mental status examinations were again normal and noted some anxiety. (*Id.* at 250).

On August 31, 2021, Plaintiff reported she had not used Ativan for two weeks, but that she had a brief panic attack after knocking a child down. (*Id.* at 240).

In addition to the above treatment records, Plaintiff saw a psychiatrist, Dr. Wunderlich, on February 23, 2021, for a consultative examination. (Doc. 6-7, pp. 291-299). At that exam, Plaintiff complained of PTSD, panic attacks, anxiety, paranoia, difficulty

leaving the house, depression, and ADD. (*Id.* at 293). She described her mood as "I feel blah," but noting that her mood at the time was below typical. (*Id.* at 295). Dr. Wunderlich noted was Plaintiff was cooperative, with a normal attitude and approach to the evaluation. (*Id.*). She spoke in an intelligible manner, with relevant, coherent, organized speech, and lucid, linear, and goal-oriented thought processes. (*Id.*). Her behavior did not suggest psychosis, and she denied suicidal ideation or thoughts of hurting others. (*Id.*). Dr. Wunderlich noted that her observed affect suggested the presence of mild anxiety. (*Id.*).

Further, Dr. Wunderlich noted that Plaintiff showed a general understanding of the purpose of the consultative examination when he briefly explained it to her. (*Id.*). As to her immediate recall, it showed no deficits. (*Id.*). She was able to immediately recall 5 out of 5 unrelated words, 3 out of 5 after a five-minute delay, and then recognized all 5 on a forced choice recognition task. (*Id.*). She was able to immediately recall 7 digits forwards and 4 digits backwards. (*Id.*). Her remote recall appeared intact. (*Id.*). Her attention and concentration were slightly below normal limits. (*Id.*). She made a simple error when asked to make change in her head and several errors on a reverse serial sevens task. (*Id.*). Dr. Wunderlich estimated her intellectual ability as in the low average range, but found her fluid reasoning, judgment, and insight intact. (*Id.*). Based on the evaluation, Dr. Wunderlich diagnosed Plaintiff with PTSD. (*Id.*).

### III.    Applicable Legal Standards

To assess an alleged disability, the ALJ employs a "five-step sequential evaluation

process." *See* 20 C.F.R. §§ 404.1520 (a)(1), (2), (4); 416.920(a)(1), (4). The ALJ asks the following questions: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) whether the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) whether, in view of the claimant's residual functional capacity ("RFC") and past relevant work, he or she can perform past relevant work; and (5) whether, in view of the claimant's RFC, age, education, and work experience, he or she can adjust to other work. *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4); *see also Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Impairments and related symptoms may cause physical and mental limitations that affect what may be done in a work setting. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). The RFC at issue in step 4 assesses the most that a claimant can do in a work setting, notwithstanding those limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n.7 (7th Cir. 2000). In this way, an RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent work schedule. *See Tenhove v. Colvin*, 927 F. Supp. 2d 557, 558 (E.D. Wis. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on all of the relevant medical and other evidence contained in the record. *See* 20 C.F.R.

§§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ must identify the claimant's functional limitations and assess his or her work-related abilities on a function-by-function basis. *See Tenhove*, 97 F. Supp. 2d at 569; SSR 96-8p, 1996 WL 374184, *1, 3; *accord Lechner v. Barnhart*, 321 F. Supp. 2d 1015, 1036 (E.D. Wisc. 2004). The ALJ considers all impairments, including those that are not severe, and the claimant's ability to meet physical, mental, sensory, and other requirements of work. *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of all impairments, 'even those that would not be considered severe in isolation.'"). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1522(a).

As part of an RFC assessment, the ALJ must consider and address medical source opinions. *See* SSR 96-8p, 1996 WL 374184, *7. If a treating physician's medical opinion on the nature and severity of an impairment is well-founded and supported by clinical and laboratory diagnostic techniques accepted in the medical field and is not inconsistent with other substantial evidence in the record, the adjudicator must give it controlling weight. *Id.*; *see also Clifford*, 227 F.3d at 870. Medical opinions are considered pursuant to the following factors: (1) supportability; (2) consistency; (3) the relationship with the claimant; (4) specialization; and (5) other factors supporting or contradicting the medical opinion, including evidence showing familiarity with other evidence in the claim or an understanding of disability policies and evidentiary requirements. *See* 20 C.F.R.

10

§§ 404.1520c(c); 416.920c(c). The most important factors to the persuasiveness of a medical opinion, however, are supportability and consistency.[3] *See* 20 C.F.R. §§ 404.1520c(a), (b)(2); 416.920c(a), (b)(2). As a matter of fact, an ALJ may, but is not required to, explain how it considered the other factors. *See* 20 C.F.R. §§ 404.1520c(c)(3)-(5); 416.920c(c)(3)-(5).

## IV.    The ALJ's Decision

The ALJ assessed Plaintiff's alleged disability under the five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520 (a)(1), (2), (4). At step one, the ALJ found Plaintiff did not engage in substantial gainful activity during the period from her alleged disability onset date of September 15, 2017, through her date last insured of March 31, 2021. (Doc. 6-3, p. 29).[4]

At step two, the ALJ found that Plaintiff suffered from severe impairments, *i.e.*, posttraumatic stress disorder (PTSD), major depressive disorder (MDD), anxiety disorder, panic disorder, and adjustment disorder. (*Id.* at 29).

At step 3, the ALJ found Plaintiff's impairments or combination of impairments did not meet or medically equal the severity of the impairments listed in the regulations. (*Id.*). In explaining the decision, the ALJ noted that, despite Plaintiff's assertion of marked limitation, the evidence shows that she had only a moderate limitation in understanding,

---

[3] The more relevant the objective medical evidence and supporting explanations presented by a medical source are to *support* his or her medical opinions, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(1); 416.920c(c)(1). The more *consistent* medical opinions are with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinions will be. *See* 20 C.F.R. §§ 404.1520c(c)(2); 416.920c(c)(2).

[4] The ALJ also found that her part-time employment at the McConnell Air Force Base from October 14, 2021, to December 28, 2021, was an unsuccessful work attempt under 20 CFR 404.1574(c) because she only performed the job for two months before she stopped working due to anxiety. (Doc. 6-3, pp. 29).

remembering, or applying information during the relevant period. (*Id.* at 31). The ALJ explained that, on evaluations, Plaintiff demonstrated the capacity to complete simple addition, subtraction, multiplication, and division problems, and that, despite a simple error when asked to make change in her head and an estimated intellectual ability in the low average range, her fluid reasoning, judgment, and insight were intact. (*Id.*). As to her limitations on social functioning, the ALJ found that Plaintiff had no more than a moderate limitation in interacting with others and was pleasant and cooperative with providers. (*Id.*). Next, the ALJ reasoned that the evidence showed that Plaintiff had no more than a moderate limitation on concentrating, persisting, or maintaining pace, though some of the findings showed she had slightly below normal attention and concentration and difficulty in following spoken instructions. (*Id.*). And, while the ALJ noted that treatment providers documented reports of Plaintiff's deficits in completing tasks due to low motivation, Plaintiff reported that she was able to care for the daily needs of her husband and two small children and denied any limitations in self-care or medications. (*Id.*). Finally, the ALJ found that there was no evidence of marginal adjustment suggesting that Plaintiff would have minimal capacity to adapt to changes in the environment or to demands that were already part of daily life, and that the record was devoid of evidence establishing medical treatment or otherwise mental health support. (*Id.* at 32).

First, the ALJ decided that Plaintiff could perform simple, routine, repetitive tasks with customary breaks, and that she could meet production requirements that allowed her to sustain a flexible and goal-oriented, though not fast, pace. (*Id.*).

Further, the ALJ found Plaintiff could tolerate occasional interaction with the public, coworkers, and supervisors, but could not perform tasks in tandem or in teams or provide customer service to the general public. (*Id.*). Similarly, the ALJ determined that she could not work in locations with dense crowds. (*Id.*).

In making these findings, the ALJ stated that all of Plaintiff's symptoms and the extent to which they could be reasonably accepted as consistent with medical and other evidence were considered. (*Id.* at 32). Accordingly, the ALJ found she could make simple work-related decisions and could adapt to changes in the work setting consistent with the noted limitations. (*Id.*).

At step 4, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at 40). The ALJ noted the vocational expert testified that, in light of her RFC, Plaintiff could not perform her past relevant work as assistant manager, which was a skilled light position. (*Id.* at 40).

Finally, at step 5, the ALJ found that, given Plaintiff's age of 28, high school education, work experience, and RFC, there were jobs in significant number in the national economy that she was able to perform. (*Id.* at 41). The ALJ noted the vocational expert testified that Plaintiff would be able to work as a hospital cleaner, linen room attendant, and laundry worker, which are medium, unskilled positions with anywhere from 3,937 to 54,480 jobs in the national economy. (*Id.*). Further, the ALJ highlighted that the vocational expert's testimony considered factors not specifically addressed in the Dictionary of Occupational Titles ("DOT"): fast-paced production, interaction, tandem tasks, teams, customer service, dealing with the public, dense crowds, absences, being off

13

task, breaks, inappropriate responses, social proximity, and sustaining concentration. As the vocational expert testified that she had resolved those factors based on her years of rehabilitation experience, the ALJ found her testimony consistent with the information in the DOT. (*Id.* at 41-42).

For these reasons, the ALJ found Plaintiff was not disabled from September 15, 2017, to March 31, 2021, which was the date last insured. (*Id.* at 42). As a result, Defendant denied Plaintiff's application for a Period of Disability and DIBs. (Doc. 6-2, pp. 20-39).

## V.    Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). In this context, "substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about whether a claimant is disabled and the ALJ's decision is supported by substantial evidence, then the Court will affirm the denial of claims. *Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). When assessing the evidence, the Court reviews the entire

14

record, but does not reweigh the evidence, resolve conflicts, decide credibility questions, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The ALJ is not required to address every piece of evidence or testimony presented, but he must build a 'logical bridge' between the evidence and his conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *see also Gedatus v. Saul*, 994 F.3d 893, 901 (7th Cir. 2021) ("The ALJ's summary does not mention every detail. But it need not."). An ALJ is not permitted to "cherry pick evidence from the record" to support a conclusion without engaging with evidence weighing against it. *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). The Court will not decline to engage in a critical review to act as a rubber stamp. *See Clifford*, 227 F.3d at 869.

Plaintiff presents two main arguments for the Court's consideration in this case. Each argument is addressed separately below.

## A. The RFC Assessment

First, Plaintiff disagrees with the ALJ's RFC assessment because it omitted moderate limitations from the medical opinion of Plaintiff's mental health provider, Irma Jeffries, L.S.C.S.W. (Doc. 9, p. 7). While Plaintiff acknowledges that the ALJ explicitly rejected Ms. Jeffries' opinion on marked and extreme limitations, Plaintiff argues that the ALJ omitted Ms. Jeffries' opinion on moderate limitations without explanation. (*Id.* at 7-8). As the omitted portions of Ms. Jeffries' medical opinion conflicted with the RFC, Plaintiff argues the RFC is not supported by substantial evidence. (*Id.* at 8). Additionally, Plaintiff claims that the ALJ's failure to evaluate moderate limitations tainted the ALJ's findings at step 5. (*Id.* at 10).

15

Plaintiff's Counselor, Irma Jeffries, L.S.C.S.W., opined that she suffered from a variety of moderated, marked and extreme limitations in different areas of mental functioning. (Tr. 639-40; Doc. 9, P. 7). She also found Plaintiff would miss more than four days of work per month and would be off-task 25% of the workday. *Id*. According to Plaintiff, the ALJ explicitly rejected the marked and extreme limitations from Ms. Jeffries's opinion but did not make any finding regarding moderate limitations. Plaintiff further emphasizes that the ALJ, without explanation, excluded the moderate limitations from RFC. She concludes that, as a result, the ALJs' RFC is not supported by substantial evidence. (Doc. 9, P. 8)

Plaintiff points to SSR 96-8p and it's requirement that the "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and nonmedical evidence." Plaintiff also directs the Court to the requirement that the "RFC assessment must always consider and address medical source opinions" and, "if the RFC assessment conflicts with an opinion of a medical source, the adjudicator must explain why the opinion was not adopted."

Plaintiff relies on the matter of *Huber v Astue*, 395 F. App'x, 299 (7th Cir. 2010). She asserts that it stands for the proposition that "[w]here the ALJ fails to explain why moderate limitations from a medical opinion were rejected, "the ALJ cannot be said to have articulated the basis for her decision."" (Doc. 9, P. 8).  Plaintiff's reliance is misplaced. In fact, *Huber* does not state that proposition.  In *Huber*, the recommending Magistrate Judge found that the ALJ had failed to even acknowledge or mention the mental health assessment opinion Mr. Huber believed to be significant. The Seventh

Circuit agreed and, while considering and ultimately reversing a denial of fees under the

EAJA, found: "Although we recognize that the 'requirement that the ALJ articulate her

consideration of the evidence is deliberately flexible,' the requirement cannot be stretched

to encompass this case, in which the ALJ ruled contrary to and failed to mention the most

directly relevant medical report. *Huber,* 395 Fed. App'x at 303. (Citing *Stein v. Sullivan,*

*966 F.2d 317, 319 (7th Cir. 1992))*.

Unlike the ALJ in *Huber,* the ALJ here did acknowledge, discuss, and assess the

medical source represented by Ms. Jeffries' opinions. But transcript is clear that the ALJ

here gave Ms. Jeffries opinions very little countenance because the evidence did not

support her opinions and because other medical sources contradicted them.  The ALJ

wrote:

> [T]he claimant had moderate to extreme limitations in concentration,
> persistence, or pace and adaptation "and that she "would be absent more
> than 4 days per month and would be off task 25% or more of the time."
> (Doc, 6-2, P. 36;Tr. 36). The undersigned finds that Ms. Jeffries' findings are
> not persuasive, as to the absence, off-task and marked to extreme
> limitations because she did not provide an explanation or records to
> support her findings. As discussed above at page 13 some deficits of
> concentration were shown, which are contemplated by the residual
> functional capacity. Ms. Jeffries' findings are not consistent with findings
> on other mental status examinations which show an anxious mood, but
> intact memory, attention and concentration. (Exhibits 9F, p.4; 11F, p. 14).
> These findings are also not consistent with the findings of Dr. Ted
> Wunderlich on February 23, 2021. During this examination, the claimant
> demonstrated slightly below normal   and concentration and low average
> intellect, but intact memory, fluid reasoning, judgment, and insight. The
> claimant made several errors on a reverse serial seven's task but was able
> to complete a serial three's task without error. She made a simple error
> when asked to make change in her head, but otherwise demonstrated the
> capacity to complete simple addition, subtraction, multiplication, and
> division problems. Dr. Wunderlich noted the claimant's reports that
> medications had decreased her symptoms of panic attacks; she also

reported being able to maintain basic care for her children, pay her bills, regularly engage with family and friends, and complete errands (Exhibit 10F). As a result, this opinion was unpersuasive as to the posited marked and extreme limitations, absences and off task behavior. *Id*

The ALJ then turned to her consideration of Dr. Wunderlich's findings and opinions and, relevant here, she stated:

> Accordingly, the undersigned finds the claimant is limited in social functioning as shown in the residual functional capacity to avoid exacerbating her symptoms. Dr. Wunderlich's findings of moderate limitations in adapting and managing oneself is, however, consistent with other evidence showing the claimant had some difficulty managing her symptoms and did have panic attack at times.

*Id*.

Unlike in *Huber*, the ALJ here acknowledged and discussed in detail the findings and opinions of a number of medical sources such that meaningful review is possible. As to Ms. Jeffries' opinions, the ALJ simply found them unpersuasive given the lack of support and their conflict with other evidence. The ALJ appropriately discussed how and why she saw Ms. Jeffries' opinions as unpersuasive. She found those opinions to be inconsistent with reports of Plaintiff's improvement in the records, reports of Plaintiff's day-to-day activities, and the objective evidence in the record as a whole. And, significantly, she found Ms. Jeffries' opinions to be without adequate explanation.

The Seventh Circuit has "emphasized that social-security adjudicators are subject to only the most minimal of articulation requirements. An ALJ need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050,

1053 (7th Cir. 2024) All that is required is for an ALJ to provide an explanation for how the evidence leads to his or her conclusions that is sufficient to allow a reviewing court to assess the validity of the agency's ultimate findings and afford a meaningful judicial review. *See Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *see also Id.* (as long as an ALJ's opinion does not "lack adequate discussion of the issues," it will be considered sufficient). "At times, we have put this in the shorthand terms of saying an ALJ needs to provide a 'logical bridge from the evidence to his conclusion.' " *Warnell*, 97 F.4th at 1053. *See also Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Here, the ALJ's discussion was adequate in the sense that she acknowledged, considered and, in the end, discounted Ms. Jeffries' opinions and, in doing so, explained why she found them to be unpersuasive. She created that logical bridge from that which appears in the record and her conclusions. No further analysis or explanation was necessary.

## B. Reliance on Vocational Expert Testimony

Plaintiff next contends that the ALJ erred by improperly relying on the vocational expert's testimony without eliciting a reasonable explanation for the apparent conflict between her testimony and the DOT.[5] (Doc. 9, p. 15). Therefore, Plaintiff argues the ALJ failed to meet her burden at step 5. (*Id.*).

---

[5] Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether there is such consistency. Policy Interpretation Ruling : Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information In Disability Decisions, 2000 WL 1898704, at *2.

Specifically, Plaintiff contends syllogistically that the ALJ's finding that she could "understand and remember detailed but not complex instructions but can only carry out simple repetitive instructions . . ." (ellipsis contained in Plaintiff's brief) implies that Plaintiff cannot carry out detailed instructions. (Doc. 9, P. 12). Plaintiff deduces from her premise that "the ALJ found that the type of instruction Plaintiff could carry out was not the type of that she could understand and remember." *Id.* She goes on to conclude in her argument that "[s]o, while she could understand and remember detailed instructions, she could not carry them out as she could "only" carry out simple repetitive instructions." Id.

But Plaintiff misquotes the record. The ALJ actually wrote: "the claimant can understand and remember detailed but not complex instructions but can only carry out simple repetitive instructions *with customary breaks*;" (Doc. 6-2, P. 29; TR. 29) (*emphasis* added). The qualification of "with customary breaks" delimits the predicate of the sentence Plaintiff criticizes. Thus, the premise for the Plaintiff's argument— that there is an internal conflict in the ALJ's reasoning — is untrue and, therefore, fails. This is significant because the three words Plaintiff omitted from the ALJ's step 5 findings make clear that Plaintiff can carry out simple repetitive instructions "if" she receives customary breaks.

Moreover, the VE testimony is consistent with the ALJ's findings, such that there is no conflict between the VE's testimony and the job requirements of the DOT. (Doc. 6-2, P. 110). The ALJ's hypothetical to the VE included the qualification of "with customary breaks". *Id*. The VE found that, in fact, work is available in the national economy that

Plaintiff would be able to perform. *Id.* And, significantly, she was not determined to be markedly or severely limited in her ability to carry out simple repetitive instructions. Her only limitation is that she needs customary breaks during her workday.

The Plaintiff also argues that the VE opined that an individual like Plaintiff could perform the occupations of a cleaner, laundry worker, and stocker but that the testimony conflicts with the DOT because those require a reasoning level of two. (Doc. 9, P. 12). A reasoning level 2 for these occupations means the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." *See* 381.687-018 Cleaner, Industrial, DICOT 381.687-018, 361.684-010 Launderer, Hand, DICOT 361.684-010, and 922.687-058 Laborer, Stores, DICOT 922.687-058. Plaintiff then concludes that the VE's testimony and, consequently the ALJ's decision conflict with the DOT because the ALJ's RFC "reveals that she intended to find Plaintiff was not just limited to "simple" instructions but that she could not carry detailed instructions." (Doc. 9, P. 13). But again, the Plaintiff misquotes the ALJ. As noted, the ALJ's RFC provides "the claimant can understand and remember detailed but not complex instructions but can only carry out simple repetitive instructions *with customary breaks*;" (Doc. 6-2, P. 29; TR. 29) (emphasis added). Thus, the Plaintiff's argument that the "ALJ's RFC reveals that she intended to find Plaintiff was not just limited to simple instructions but that she could not carry out detailed instructions" necessarily fails. *Id.*

So, contrary to Plaintiff's argument, there is no "apparent unresolved conflict" that required the ALJ to resolve through further explanation or through eliciting further testimony from the VE. *See* Pol'y Interpretation Ruling : Titles II & Xvi: Use of Vocational

Expert & Vocational Specialist Evidence, & Other Reliable Occupational Info. in Disability Decisions, SSR 00-4P (S.S.A. Dec. 4, 2000).

## VI.    Conclusion

The Court finds that the ALJ properly addressed all of Plaintiff's concerns and built an accurate and logical bridge from the evidence to her conclusions, thus allowing this Court to meaningfully review his decision. Thus, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: March 31, 2025

s/*David W. Dugan*
DAVID W. DUGAN
United States District Judge